IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GEORGE SMALLWOOD, *et al.*,　　　)
　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　　Civil Action No. 3:23cv67 (RCY)
ACE PROPERTY & CASUALTY　　　　)
INSURANCE CO., *et al.*,　　　　　　)
　　　Defendants.　　　　　　　　　)
　　　　　　　　　　　　　　　　)

## MEMORANDUM OPINION

This is a declaratory judgement action brought by Plaintiff George Smallwood ("Plaintiff" or "Smallwood"), seeking a determination of insurance coverage.[1]  The case is before the Court on Defendant ACE Property & Casualty Insurance Company's ("ACE") Motion to Dismiss the Amended Complaint (ECF No. 36).  The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated below, the Court will grant ACE's Motion to Dismiss.

## I. BACKGROUND

When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts

---

[1] The case was initially brought by Smallwood against Builders Mutual Insurance Company ("Builders Mutual"), BD Joint Ventures, LLC, VA Express, LLC, Williams Contracting, Inc., Paul Stevens, Kelley & Associates Construction Management, Inc., and David Jordan LLC.  Pursuant to this Court's Order on August 10, 2023, all parties other than Builders Mutual have been realigned as plaintiffs.  Order, ECF No. 13.  Pursuant to that same Order, Smallwood was permitted to amend his Complaint to include claims against ACE Property & Casualty Insurance Company ("ACE") and Alsop Trucking, Inc.  *See id.*  Thereafter, Plaintiff amended his Complaint to add an additional declaratory judgment count against ACE.  *See* Am. Compl. ¶¶ 83–92, ECF No. 14.

This Court recently dismissed Plaintiff's claims against Builders Mutual.  *See Smallwood v. Builders Mut. Ins. Co.*, 2024 WL 844868, at *13–19 (E.D. Va. Feb. 28, 2024).  Therefore, the only remaining claims lie against ACE.  *See* Am. Compl. ¶¶ 83–92.

and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).   Such a standard, however, does not require accepting any unreasonable inferences or plaintiff's legal conclusions. *Id.*   Additionally, a court may consider any documents attached to the complaint. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (stating that "a court may consider [a document outside the complaint] in determining whether to dismiss the complaint" where the document was "integral to and explicitly relied on in the complaint" and there was no authenticity challenge).   Applying these standards, the Court construes the facts in the Complaint, including any attached documents, as follows.

## A. Plaintiff's Injury

In June of 2016, Kelley & Associates Construction Management, Inc. ("Kelley & Associates") hired Plaintiff to oversee the transport of materials that it had purchased to construct an Express Oil Change in Mechanicsville, Virginia (the "Express Oil Change").   Am. Compl. ¶ 17, ECF No. 14; *see* Am. Compl. ¶¶ 9, 12, 14–17.   Plaintiff was acting in that capacity on June 16, 2016, when he requested that Bell Nurseries and Alsop Trucking, Inc. ("Alsop") each provide a driver and flatbed tractor trailer ("tractor trailer(s)" or "truck(s)") to assist him in picking up and transporting construction materials to the Express Oil Change. *Id.* ¶¶ 17, 19.   Thereafter, Plaintiff "oversaw the successful loading  of . . . construction materials in Winchester, Virginia" onto the three tractor trailers, and "coordinate[d their] same day delivery" to the Express Oil Change. *Id.* ¶ 21.

Plaintiff and the drivers of the other tractor trailers encountered limited parking when they arrived at the Express Oil Change construction site. *Id.* ¶¶ 22–23.   There was also limited space for Plaintiff and the other drivers to offload the materials they had in tow. *Id.*  ¶ 23.   As a result,

each tractor trailer was "required to pull into a narrow area, off-load one side of its trailer, then turn around and be re-positioned so that the other side of the trailer could be off-loaded." *Id.* Plaintiff first assisted the Bell Nurseries driver in successfully offloading both sides of the tractor trailer. *Id.* ¶ 24.  Plaintiff did so by utilizing a truck-mounted Moffett forklift. *Id.* ¶ 25.

Plaintiff then turned his attention to the Alsop tractor trailer which was "loaded with concrete block [sic] on one side and bags of cement topped with rebar bundles on the other." *Id.* ¶ 27; *see id.* ¶¶ 26–27.  Plaintiff first used hand signals to assist Alsop's driver in positioning his tractor trailer for offloading. *Id.* ¶ 26.  Plaintiff then successfully offloaded the concrete block with a Moffett forklift. *Id.* ¶ 28.  Next, Plaintiff assisted Alsop's driver in repositioning the Alsop tractor trailer so that the remainder of the construction materials could be offloaded. *Id.*  It soon became apparent that the remainder of the load—the bags of cement topped with rebar bundles—was too tall for the Moffett forklift. *See id.* ¶ 29.  Plaintiff asked Paul Stevens ("Stevens"), the site supervisor, if he had anything on site capable of reaching the rebar bundles. *Id.*  Stevens offered to assist Plaintiff by using an on-site Bobcat skid steer loader ("Bobcat") despite lacking the proper training to do so. *Id.* ¶ 30.  Unaware that Stevens was not properly trained to operate the Bobcat, Plaintiff accepted Stevens's assistance. *Id.* ¶ 31.

Soon thereafter, Stevens left the Alsop tractor trailer and "returned driving a Bobcat . . . fitted with 'tines' or 'forks[.]'" *Id.* ¶ 32.  Plaintiff then climbed atop the Alsop trailer and instructed Stevens, using voice commands and hand signals, on how to properly navigate the Bobcat over to the Alsop trailer. *Id.* ¶¶ 29, 33–34.  Once the Bobcat was loaded with rebar from the Alsop trailer, Plaintiff climbed down off the trailer to continue helping Stevens maneuver the Bobcat. *See id.* ¶¶ 35–36.  Using hand signals once again, Plaintiff assisted Stevens with turning the Bobcat around so that it would face the delivery site where they would be dropping off the

rebar. *Id.* ¶¶ 37–38.   Plaintiff then turned to face the delivery site and began walking toward it, maintaining a distance of about ten feet from the Bobcat while continuing to give Stevens hand-signal guidance.   *See id.*; Am. Compl. Ex. 4 ("Chesterfield County Compl.") ¶ 34, ECF No. 14-4. However, Stevens improperly failed to "lower the hydraulic lift cylinder to balance the weight of the load." Am. Compl. ¶ 38.  When Stevens then attempted to move forward without lowering the hydraulic lift cylinder, it caused the Bobcat to jolt forward, resulting in a weight shift that toppled the Bobcat. *Id.* ¶ 40; *see id.* ¶¶ 41–43.  As the Bobcat tipped over onto its front tires and extended forks, the rebar fell off the loader, "striking [Plaintiff] and pinning him to the ground." *Id.* ¶ 41. Plaintiff was then trapped under the rebar for several minutes, suffering a "fractured left ankle, fractured arm requiring surgery, and permanent crush injuries to his left foot." *Id.* ¶ 42.

## B. The ACE Policy

At the time of the June 16, 2016, incident, the Alsop tractor trailer was covered by a Commercial Auto Policy, Policy No. H08673494, issued by ACE (the "Policy").  *Id.* ¶ 16; *see* Mem. Supp. Mot. Dismiss Ex. A ("ACE Policy") 56–57[2], ECF No. 37-1.[3]  The Policy provided liability and uninsured/underinsured motorist coverage for the Alsop tractor trailer.  *Id.*   The provisions of the Policy most relevant for present purposes are excerpted below:

---

[2] For this and all other filings, the Court utilizes the pagination assigned by the CM/ECF system and not the pagination appearing on the original document.

[3] ACE attached a copy of the Policy to its Memorandum in Support of its Motion to Dismiss.  *See generally* ACE Policy.  The Court may consider this document in conjunction with its Rule 12(b)(6) analysis because the Policy itself is "integral to and explicitly relied on in the [C]omplaint," and Plaintiff has not challenged its authenticity. *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *see Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips*, 190 F.3d at 618).

**UNINSURED MOTORISTS ENDORSEMENT (VIRGINIA)**

### A. Words And Phrases With Special Meaning

The following words and phrases have special meaning throughout this endorsement and appear in quotation marks when used:

\* \* \*

**6.** "Covered auto" means a motor vehicle or a "temporary substitute", with respect to which the "bodily injury" or "property damage" liability coverage of the policy applies.

\* \* \*

**8.** "Insured" means any person or organization qualifying as an insured in the **Who Is An Insured** section of this endorsement.

\* \* \*

**11.** "Occupying" means in, upon, using, getting in, on, out of or off.

\* \* \*

**13.** "Underinsured motor vehicle" means a motor vehicle when, and to the extent that, the total amount of "bodily injury" and "property damage" coverage applicable to the operation or use of the motor vehicle and "available for payment" for such "bodily injury" or "property damage", including all bonds or deposits of money or securities made pursuant to Article 15 (Section 46.2-435 et seq.) of Chapter 3 of Title 46.2 of the Code of Virginia, is less than the total amount of uninsured motorist coverage afforded any person injured as a result of the operation or use of the motor vehicle.

**14.** "Uninsured motor vehicle" means a motor vehicle:

**a.** For which:

**1.** There is no "bodily injury" liability insurance and "property damage" liability insurance in the amounts specified by Section 46.2-472 of the Code of Virginia.

**2.** There is such insurance but the insurer writing the insurance denies coverage for any reason whatsoever, including failure or refusal of the insured to cooperate with the insurer.

**3.** There is no bond or deposit of money or securities in lieu of such insurance.

**4.** The owner of the vehicle has not qualified as a self-insurer under the provisions of Section 46.2-368, or

**5.** The owner or operator of the motor vehicle is immune from liability for negligence under the laws of the Commonwealth or the United States. A motor vehicle shall be deemed uninsured if its owner or operator is unknown. If the owner or operator of any motor vehicle that causes "bodily injury" or "property damage" to the "insured" is unknown, and if the damage or injury results from an "accident" where there has been no contact between that motor vehicle and the motor vehicle occupied by the "insured", or where there has been no contact with the person of the "insured" if the "insured" was not "occupying" a motor vehicle, then for the "insured" to recover under this endorsement pursuant to Paragraph **a.** of this definition, the "accident" shall be reported promptly to either:

    **1.** The insurer or;

    **2.** A law enforcement officer having jurisdiction in the county or city in which the "accident" occurred. If it is not reasonably practicable to make the report promptly, the report shall be made as soon as reasonably practicable under the circumstances.

**b.** Which is an "underinsured motor vehicle".

\* \* \*

**D. Who Is Insured**

\* \* \*

    **2.** Anyone else "occupying" a "covered auto".

ACE Policy 56–57.

To reiterate, the Policy covered *only* the Alsop tractor trailer. Am. Compl. ¶ 16. It is unclear, however, whether the Bobcat that ultimately tipped over and pinned Plaintiff was insured

at the time of the incident.  Plaintiff makes no explicit allegations regarding the Bobcat's insurance, alleging only that it was owned by Envirostruct, LLC.  Chesterfield County Compl. ¶ 34.[4]

## II. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2).  *Id.* (citations omitted).  "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff.  *Id.* (citations omitted); *see also Martin*, 980 F.2d at 952.

---

[4] The Court notes that this specific allegation comes from Plaintiff's Complaint in a related state court case. The Court may nevertheless consider such allegation because Plaintiff attached that Complaint to his Amended Complaint in the instant matter.  *See  E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id*.

## III. DISCUSSION

The present dispute centers around whether Plaintiff qualifies as an insured under the ACE Policy. *See* Mem. Supp. Mot. Dismiss ("Mem. Supp.") 12–19, ECF No. 37; Pl.'s Mem. Opp'n Def.'s Mot. Dismiss ("Mem. Opp'n") 8–15, ECF No. 43. If Plaintiff cannot qualify as an insured under the Policy, his Complaint must be dismissed for failure to state a claim. Alternatively, if the alleged facts support Plaintiff's claim to "insured" status, his Complaint will survive the Rule 12(b)(6) stage. For the reasons outlined below, the Court finds that Plaintiff has no viable avenue to establishing his status as an "insured" under the Policy. The Court will therefore dismiss Plaintiff's Complaint.

### A. Plaintiff Does Not Qualify as an Insured Under the Policy

Plaintiff's argument for coverage is as follows: that he was "using" and/or "occupying" the Alsop tractor trailer at the time of the incident, and, therefore, he is an "insured" entitled to uninsured or underinsured motorist coverage under the Policy. Am. Compl. ¶¶ 85–87, 89; *see* Mem. Opp'n 8–15. This argument fails at the first step.

1. Insurance Contract Interpretation

Before analyzing the Policy itself, a brief outline of the relevant legal principles is in order. To begin with, "[a] federal court sitting in diversity jurisdiction must apply the choice-of-law rules of the forum state." *Phila. Indem. Ins. Co. v. Assoc'd Univs., Inc.*, 2021 WL 4484556, at *5 (W.D. Va. Sept. 29, 2021) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Here, the forum state is Virginia, and "[i]n insurance coverage disputes, the general rule in Virginia is that 'the law of the place where an insurance contract is written and delivered controls issues as to its coverage.'" *Id.* (quoting *Buchanan v. Doe*, 246 Va. 67, 70 (1993)).  Here, the Policy was formed and issued in Virginia, and the parties do not dispute the application of Virginia law. *See* Mem. Supp. 5–6, 8–10, 12; Mem. Opp'n 8–15.  Virginia, in turn, has adopted the Eight Corners Rule under which the Court may "look primarily at the underlying complaints and the insurance policy to determine if there is a potential for coverage." *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009); *Am. Online, Inc. v. St. Paul Mercury Ins. Co.*, 207 F. Supp. 2d 459, 465 (E.D. Va. 2002) ("[T]he 'eight corners rule' requires review of '(1) the policy language to ascertain the terms of the coverage and (2) the underlying complaint to determine whether any claims alleged therein are covered by the policy.'").

2. Plaintiff Was Not "Using" or "Occupying" the Alsop Tractor Trailer at the Time of the Incident

Cognizant of these principles, the Court turns to the parties' arguments.  ACE argues that Plaintiff was not "using" the insured vehicle (the Alsop tractor trailer) because (a) there was no causal connection between the Alsop tractor trailer and Plaintiff's injuries, and (b) Plaintiff's unrelated activities with respect to the Bobcat affirmatively demonstrate that he was not using the Alsop tractor trailer.  *See* Mem. Supp. 13–18.  Consequently, ACE argues that Plaintiff is not entitled to coverage under the Policy.  *See id.* at 12.  Plaintiff responds that he is entitled to coverage

because he was "using" the Alsop tractor trailer as contemplated by Virginia Code § 38.2-2206. Mem. Opp'n 8, 10; *see* Mem. Opp'n 10–13.   Plaintiff also argues that he entitled to coverage because he was "occupying" the Alsop tractor trailer pursuant to the Policy.   Mem. Opp'n 8, 10, 12–14; *see* Mem. Opp'n 10–14.   The Court considers these arguments below.

       *a. "Use"*

Virginia Code § 38.2-2206(A) mandates that motor vehicle liability insurance policies provide uninsured and underinsured coverage to persons *insured* under those policies.   *See* VA. CODE ANN. § 38.2-2206(A).   In turn, § 38.2-2206(B) defines an "insured" as "any person who *uses* the motor vehicle to which the policy applies, with the express or implied consent of the named insured."   *Id.* § 38.2-2206(B) (emphasis added).   The "critical inquiry" in determining whether a person has "used" a vehicle such as to render them an "insured"  involves assessing "whether there was a causal relationship between the incident and the employment of the insured vehicle as a vehicle."   *Slagle v. Hartford Ins. Co.*, 267 Va. 629, 635 (2004).

Turning to the parties' arguments, Defendant urges dismissal of Plaintiff's Complaint on the grounds that Plaintiff was not "using" the Alsop tractor trailer when he was injured.   Mem. Supp. 12.   Defendant raises three main points in support of this contention.   *See id.* at 13–18.   First, Defendant argues that the Complaint fails to allege facts demonstrating a causal relationship between the Alsop tractor trailer and Plaintiff's injuries.   *See id.* at 13–15.   Defendant relies heavily on *United States Fire Insurance Company v. Parker* for this portion of its argument.   *See id.* at 13–14 (citing *U.S. Fire Ins. Co. v. Parker*, 250 Va. 374 (1995)).   Defendant next argues that Plaintiff's use of hand signals to direct the Bobcat—a separate vehicle—does not show that he was "using" the Alsop tractor trailer.   *Id.* at 15–16.   In so arguing, Defendant distinguishes the instant facts from those of *Slagle v. Hartford Insurance Company of the Midwest*.   *See id.* (citing *Slagle*, 267

Va. at 637–38).  In *Slagle*, the Supreme Court of Virginia held that directing an *insured* vehicle with hand signals can constitute use of such vehicle.  *See Slagle*, 267 Va. at 637–38.  Defendant contrasts the facts from *Slagle* with the present ones by emphasizing that Plaintiff's hand signals were directed at the Bobcat rather than the insured Alsop tractor trailer.  Mem. Supp. 15–16.  Lastly, Defendant contends that Plaintiff's actions at the time of the accident (i.e., directing the Bobcat) confirm he was not using the Alsop tractor trailer.  *See id.* at 16–18.

Plaintiff counters that the caselaw does support his position that he was "using" the Alsop tractor trailer at the time he was injured.  Specifically, Plaintiff relies on *Bratton v. Selective Insurance Company of America* and an alternative reading of *Slagle* to argue that an individual need not be "using" a vehicle in the strictest sense of the word for their actions to nevertheless qualify as "use" under Virginia Code § 38.2-2206(B).  *See* Mem. Opp'n 8–10.  Plaintiff also questions the *Parker* holding, suggesting that it "might be decided differently today" in light of the "*Moore* [*v. Progressive Universal Insurance Company*], *Bratton*, and *Slagle* holdings."  *Id.* at 10.  Plaintiff then turns to the facts alleged here and argues that his "numerous and extensive interactions with the Alsop tractor trailer, the Alsop driver, and the trailer, satisfy the critical inquiry as to whether there was a causal relationship between the incident resulting in [his] injuries and the employment of the Alsop tractor trailer."  *Id.* at 10; *see id.* at 10–12.  Finally, Plaintiff argues that his "'use' of the Alsop trailer is consistent with a number of other Virginia Supreme Court holdings."  *Id.* at 12; *see id.* at 12–13 (citing *Great Am. Ins. Co. v. Cassell*, 239 Va. 421 (1990); *Edwards v. Gov't Emps. Ins. Co.*, 256 Va. 128 (1998); *Randall v. Liberty Mut. Ins. Co.*, 255 Va. 62 (1998)).

Before proceeding to its more substantive analysis, the Court first notes that the Policy, in accordance with Virginia Code § 38.2-2206(B), included an "Uninsured Motorists Endorsement."

*See* ACE Policy 56.  Pursuant to that endorsement, any person "occupying" a covered motor vehicle is considered an "insured" under the Policy.  *Id.* at 57.  "Occupying" is further defined as "in, upon, *using*, getting in, on, out of or off."  *Id.* at 56 (emphasis added).  Thus, consistent with the Virginia Code mandate, any person "using" a covered motor vehicle is considered an "insured" under the ACE Policy.  *See id.*  Importantly, "whether the obligation is found in the insurance policy itself, or can be found only in the Code, the meaning of 'use' or 'using' is the same because '[t]he provisions of . . . Code § 38.2-2206 are part of the contract of insurance.'"  *Bratton v. Selective Ins. Co. of Am.*, 290 Va. 314, 329 (2015) (quoting *Dyer v. Dairyland Ins. Co.*, 267 Va. 726, 731 (2004)).

Under Virginia law, the "critical inquiry" in determining whether a person has "used" a vehicle such as to render them an "insured" involves assessing whether there exists a causal relationship between the incident and the "employment of the insured vehicle as a vehicle."  *Slagle*, 267 Va. at 635.  Because resolution of the "use" inquiry necessarily depends upon the specific factual circumstances of a case, it is not amenable to "resolution by strict guidelines or a set formula."  *Id.*  The Supreme Court of Virginia has nevertheless established general guidelines for analyzing "use" in the context of the Virginia Code.  *See Moore v. Progressive Univ. Ins. Co.*, 661 F. Supp. 3d 469, 476 (E.D. Va. 2023) (discussing Supreme Court of Virginia caselaw).  These guidelines include that (1) "[t]he injured person must be using a vehicle as a vehicle and as an integral part of [the user's] mission"; (2) "[a]ctual use of the vehicle as a vehicle is not restricted to its transportation function"; and (3) "[u]se of the vehicle need not be the direct, proximate cause of the injury in the strict legal sense."  *Bratton*, 290 Va. at 330 (quoting *Slagle*, 267 Va. at 636); *see Moore*, 661 F. Supp. 3d at 476.

Acknowledging the "infinite variety of factual patterns in which the question arises," the Supreme Court of Virginia has declined to further delineate the parameters of the terms "use" or "using" for the purposes of a motor vehicle insurance policy. *Bratton*, 290 Va. at 330. Instead, the Supreme Court of Virginia has noted that "adequate guidance . . . can be found by reviewing [its] prior decisions on the issue of 'using' a vehicle." *Id.* (citing *Simpson v. Va. Mun. Liab. Pool*, 279 Va. 694, 699–701 (2010); *Slagle*, 267 Va. at 634–37). Heeding this guidance, the Court shifts its focus to the relevant caselaw. Importantly, the Court "need not review the full body of case law pertaining to whether an individual was 'using' a vehicle." *See Bratton*, 290 Va. at 330. Rather, the Court will focus on several cases that present "factual situations particularly instructive for the facts of this case." *Id.*

The first of those cases is *Cassell*. There, fire fighters—including Cassell—parked a pumper truck and tanker truck, the insured vehicles, on a city street near a disabled car that was on fire. *Cassell*, 239 Va. at 422. Cassell rode to the scene in the pumper truck "that was parked with its lights burning 20 to 25 feet from the car." *Id.* The fire trucks were positioned to "restrict or influence the flow of traffic and to provide a protective barrier for the fire fighters." *Id.* Additionally, a fire hose connected to Cassell's pumper truck was used to extinguish the fire. *Id.* Cassell later used a crowbar from the same truck to open the hood of the disabled car. *Id.* Shortly thereafter, Cassell was struck and killed by a hit-and-run driver. When he was hit, Cassell was standing in the street approximately twenty to twenty-five feet from his truck completing a required report using a clipboard from his truck. *Id.* at 423.

The Supreme Court of Virginia ultimately held that Cassell was "using" the pumper truck pursuant to Virginia Code § 38.2-2206(B). *Id.* at 424. Several facts apparently compelled such a conclusion. *See id.* First, the Court noted that the fire fighters had parked the pumper and tanker

trucks on opposite sides of the disabled car to "creat[e] a barrier to control traffic and protect the fire fighters." *Id.* Next, the Court noted that Cassell's truck was "used to pump water (which was stored on the truck) through hoses to extinguish the fire." *Id.* Further, the clipboard and pad that Cassell used to complete the required fire report were transported to the scene in the insured fire truck and to be returned to said fire truck afterward. *Id.* And in fact, "[i]tems . . . taken from Cassell's truck to extinguish the fire were being returned to the truck when the accident occurred." *Id.* Taken together, these facts indicate that the "use of the fire truck . . . was an integral part of the fire fighters' mission," a mission that had "not yet been completed when the accident occurred." *Id.* Thus, because Cassell was "engaged in a transaction essential to the use of the fire truck when he was killed," the Supreme Court of Virginia held that he was in fact "using" the truck pursuant to Virginia Code § 38.2-2206(B). *Id.*

In reaching this conclusion, the *Cassell* Court contrasted its facts with those of *Insurance Company of North America v. Perry.  See id.* (citing *Ins. Co. of N. Am. v. Perry*, 204 Va. 833 (1964)).  In *Perry*, the decedent, Peterson, was an on-duty police officer who had left his police car to serve a warrant.  *Perry*, 204 Va. at 834.  Peterson parked his cruiser, placed the keys in his pocket, and exited the vehicle.  *Id.* He and another officer walked down the road approximately 164 feet away from the police cruiser.  *Id.* Peterson was then struck and killed by another driver. *Id.* On appeal, the Supreme Court of Virginia held that Peterson was not "using" the insured cruiser because at the time he was struck and killed, he was (1) 164 feet away from the parked cruiser, and (2) engaged in a separate transaction (i.e., serving a warrant).  *Id.* at 838.  Later clarifying the import of *Perry*'s facts, the *Casell* Court noted that Cassell—unlike Peterson—*was* using the insured vehicle because he "was engaged in a transaction essential to [the use of the insured vehicle] when he was killed." *Cassell*, 239 Va. at 424.

Five years after the *Cassell* decision, the Supreme Court of Virginia revisited "use" in *Parker*. Parker, a landscape gardener, drove a pickup truck loaded with her co-workers, cabbages, and landscaping tools to a worksite where they were to plant the cabbages. *Parker*, 250 Va. at 376. A two-way radio was installed in the pickup truck, and the workers were required to leave the radio "on" at all times, "enabling them to receive messages from their supervisor." *Id.* Upon arrival at the worksite, and without having received any instructions to do so, Parker "parked the truck . . . in such a position as to provide a 'safety barrier' to protect" her and her co-workers from speeding motorists. *Id.* Parker also left a door of the truck open while planting cabbages so that she and the others could hear the radio. *Id.* Sometime later, an individual named Healy was driving through the same area when he "lost control of [the] motor vehicle he was operating[,] . . . struck the truck [Parker had driven,] and then struck Parker as she was digging a hole in a flower bed 12 to 15 feet from the truck." *Id.* At the time Parker was struck, the workers had not yet completed their task; some cabbages remained in the truck, and they still needed to clean up the area. *Id.*

Following this incident, Parker sued Healy. *Id.* at 375. Healy's insurance company then initiated a declaratory judgment action against Parker seeking a declaration that Parker was not an insured under the underinsured motorist portions of Healy's policy. *Id.* The lower court ruled in Parker's favor, but the Supreme Court of Virginia reversed. *See id.* at 377–78. In so doing, the *Parker* Court distinguished the facts in front of it from those in *Cassell*:

> Unlike the deceased in *Cassell,* the claimant in the present case was not engaged in a transaction essential to the use of the pickup truck when she was injured . . . [because] she was not utilizing the truck as a vehicle at that time. She was 12 to 15 feet away from the truck with her foot on a shovel in the act of digging a hole when struck. The facts that the workers, independently and not because of any requirement by [their employer], positioned the truck (which had no special, emergency warning lights) as a barrier, and that the radio was operating at the time . . . do[]not bring this case within the *Cassell* precedent. In *Cassell,* the fire truck's lights were burning, a hose connected to the truck used water carried on the truck to extinguish the fire, and emergency vehicles suitable for use to control

> traffic were utilized as barriers at the scene.  Here, the truck merely was used as a
> means of transportation so that Parker could complete her landscaping duties.

*Id.* at 378.  For these reasons, the *Parker* Court entered judgment in favor of the insurer "declaring

that it does not owe underinsured motorist coverage to Parker under the statutorily mandated

provisions of its insurance contract."  *Id.*

Two more recent instances of the Supreme Court of Virginia examining "use" are *Slagle*

and *Bratton*.  *Slagle* involved a scenario wherein the Plaintiff, Slagle, used hand signals to direct

the driver of an insured tractor trailer.  *Slagle*, 267 Va. at 631–32.  The driver of the tractor trailer

observed Slagle's hand signals via the tractor's side view mirror while Slagle himself stood about

ten to thirty feet behind the vehicle.  *Id.* at 632.  While Slagle was directing the tractor trailer into

the desired position, he was struck and injured by a separate vehicle.  *Id.*  Slagle proceeded to file

a declaratory judgment action against Hartford Insurance Company of the Midwest, the insurer of

the tractor trailer, seeking a "declaration that he was an insured under the underinsured motorist

provisions of the policy Hartford had issued to Vico," the owner of the tractor trailer.  *Id.*

Ultimately, the Supreme Court of Virginia held that "Slagle was [']using['] the

tractor[]trailer in a manner contemplated by Code § 38.2-2206(B)."  *Id.* at 638.  The Court first

stated that the tractor trailer was "clearly . . . being used as a 'vehicle,'" as it was "being employed

to transport and . . . position . . . construction equipment."  *Id.* at 637.  The bigger issue, per the

Court, concerned "whether Slagle [himself] was using it in that capacity."  *Id.*  Finding that he was

so "using" the tractor trailer, the Court noted that "Slagle's hand signals to the driver effectively

determined the direction and movement of the tractor[]trailer and were required for the driver for

the completion of the intended maneuver of the vehicle."  *Id.*  In other words, "there was a causal

relationship between the incident in which Slagle was injured and the employment of the

tractor[]trailer as a vehicle."  *Id.*  Given that "the critical inquiry in determining the issue of

use . . . [concerns] whether there was a 'causal relationship between the incident and the employment of the insured vehicle as a vehicle,'" the Court was satisfied that Slagle's hand signals qualified as a "use" of the tractor trailer. *Id.* at 637–38 (citing *Parker*, 250 Va. at 377).

Finally, *Bratton* involved a paving superintendent at a construction site who regularly used his pickup truck as a "safety tool" by placing it between the workers and the traffic, outfitting it with a flashing and spinning safety strobe light, turning on its headlights and hazard lights, and periodically moving it to remain near workers on the site. *Bratton*, 290 Va. at 320–21. When Slone, a dump truck operator working on the site, exited his dump truck to check for spillage, he was struck and killed by a drunk driver. *Id.* The Court determined that Slone was "using" the paving superintendent's pickup truck at the time of accident, even though he was approximately 200 feet away from the pickup when he was struck by the passing car. *Id.* at 331. Because the purpose of the superintendent's pickup truck was to protect the workers, functioning as "a rolling barricade . . . among all the other safety equipment at the [jobsite]," and because its equipment made it a specialized vehicle "designed to be used for more than simply transportation," Slone was held to be "using" it for his road construction mission. *Id.* Thus, the Court held that Slone and his estate were entitled to underinsured motorist coverage. *Id.*

With a full picture of the relevant caselaw now before it, the Court holds that the facts alleged are insufficient to establish that Plaintiff was "using" the Alsop tractor trailer at the time he was injured. Simply, the alleged facts align much more closely with the likes of *Parker*[5] and *Perry* than any of *Cassell, Slagle*, or *Bratton*.

---

[5] Plaintiff curtly dismisses the import of *Parker*, even suggesting that it might be decided differently today "[g]iven the *Moore, Bratton*, and *Slagle* holdings." Mem. Opp'n 9–10. The Court disagrees for several reasons. Perhaps most important is the fact that *Parker* has been cited approvingly on numerous occasions in the years since it has been decided. *See, e.g., Randall v. Liberty Mut. Ins. Co.*, 255 Va. 62, 65–67 (1998) ("Two of our prior cases, [*Cassell* and *Parker*,] provide the analytical framework for determining whether a permissive user of an insured vehicle who is injured while away from the vehicle qualifies as an insured."); *Slagle*, 267 Va. at 635 ("In *Parker*, we observed that the critical inquiry in determining the issue of use . . . is whether there was a causal relationship between

Plaintiff, like Parker, was (1) less than twenty feet away from the insured vehicle at the time he was injured, *see Parker*, 250 Va at 376; and (2) engaged in a transaction separate from—and nonessential to the use of—the insured vehicle (here, directing the Bobcat; in *Parker*, planting the cabbages), *see id.* at 377–78. Accordingly, Plaintiff, like Parker, was "not utilizing the [Alsop] truck as a vehicle"—i.e., "*using*" it—at the time he was injured. *Id.* at 378. Rather, Plaintiff and his coworkers had merely utilized the Alsop tractor trailer to transport construction materials to the site. *Compare id.* ("Here, the truck merely was used as a means of transportation so that Parker could complete her landscaping duties."), *with* Am. Compl. ¶ 19 ("Alsop . . . provided a driver and [truck] to pick up and transport . . . construction materials to the site.").

To be sure, Plaintiff's overall mission was "not complete until all construction material[s] were safely off-loaded to the . . . 'drop zone.'" Am. Compl. ¶ 19. However, the broad task of "pick[ing] up and transport[ing] . . . construction materials" to the Express Oil Change site is distinct from the more discrete task of "using" the Alsop tractor trailer. *See id.* The *Parker* holding crystallizes this point: though Parker and her coworkers had taken the insured truck to the site and would, like Plaintiff, need to return to it to retrieve necessary materials, Parker herself was not "using" the truck at the time she was injured because she was engaged in a separate, distinct task—planting the cabbages. *See Parker*, 250 Va. at 376–78. So too here. It is immaterial that Plaintiff would have needed to return to the Alsop tractor trailer to continue the process of offloading construction materials. Instead, all that matters for purposes of the "use" inquiry is that

---

the incident and the employment of the insured vehicle as a vehicle.") (internal citations omitted). Indeed, *Parker* was even cited approvingly in some of the decisions that Plaintiff suggests would lead to it being decided differently today. *See, e.g., Slagle*, 267 Va. at 635; *Bratton*, 290 Va. at 330. The Court is therefore satisfied that *Parker* remains good law.

The Court also notes that Plaintiff's reference to *Moore* as altering the use inquiry is peculiar, insofar as *Moore* is a decision of this Court interpreting Virginia law. *See Moore*, 661 F. Supp. 3d at 475. Such a decision has little, if any, influence on how *Virginia* courts—let alone the Supreme Court of Virginia—would interpret "use" under Virginia law.

Plaintiff was engaged in a different task—directing Stevens's operation of the Bobcat—when he was injured.  Because *that* task was not "a transaction essential to the use of [the Alsop tractor trailer]," *id.* at 378, Plaintiff was not "using" the Alsop tractor trailer at that time.  Further bolstering this conclusion is the fact that use of the Alsop tractor trailer was no longer an "integral part" of Plaintiff's mission at the time he was injured.  *Bratton*, 290 Va. at 330 (quoting *Slagle*, 267 Va. at 636).  Rather, Plaintiff and Stevens had already safely retrieved construction materials from the tractor trailer.  Thus, by the time Plaintiff was injured, his mission had undoubtedly shifted to transporting such materials to their drop zone.  The only vehicle integral to *that* mission was the Bobcat.

For the reasons outlined above, Plaintiff's allegations are insufficient to establish the requisite causal connection between his "employment of the insured vehicle as a vehicle" on the one hand, and his injuries on the other.  *Slagle*, 267 Va. at 635; *see Bratton*, 290 Va. at 329.  Further comparison of the present facts to those in the other cases outlined above reinforces this point.  For instance, in *Perry*, the decedent was deemed to not be using his police cruiser because he was 164 feet away from his insured cruiser and in the process of serving a warrant when he was struck and killed by another vehicle.  *Perry*, 204 Va. at 838.  It did not matter that he had emerged from his cruiser to engage in this task, nor that he would return to it shortly after completing the task.  *See id.*  The same is true here—at the time he was injured, Plaintiff was spatially distant from the Alsop tractor trailer (albeit to a lesser degree) and had begun the distinct task of directing the Bobcat operator to the drop zone after he had already retrieved the construction materials.

By contrast, the plaintiffs (and/or their decedents) in *Cassell*, *Slagle*, and *Bratton* were held to be "using" their respective insured vehicles.  In each instance, some combination of the following was true:  (1) the plaintiff/decedent was using something that had been retrieved from

19

the insured vehicle, *see Cassell*, 239 Va. at 424 (noting that Cassell was filling out a required fire report that had been transported to the scene in the insured pumper truck); (2) the insured vehicle was outfitted for some special purpose and the plaintiff/decedent was explicitly utilizing it *for that purpose* at the time of the incident, *see id.* (observing that Cassell's fire truck had its emergency lights burning and that it was overtly used as a barrier to control traffic and protect the fire fighters), *Bratton*, 290 Va. at 320–21, 330 (stating that the express purpose of the superintendent's truck, which was outfitted with a spinning safety strobe light and hazard lights, was to protect the workers); and (3) the plaintiff was actively engaged with and/or exercising control over the insured vehicle or its operator, *see Slagle* 267 Va. at 631–32 (observing that plaintiff was using hand signals to direct the driver of the *insured* vehicle).

Here, only the first of the above is present, insofar as Plaintiff was directing a separate vehicle that had retrieved supplies from the insured vehicle. However, as *Parker* instructs, that fact alone is insufficient to establish use. *See Parker* 375–78 (holding that the plaintiff was not using the insured truck even though she was (a) planting cabbages that were transported to the worksite in the truck, and (b) would need to return to the truck to retrieve and plant the remainder of the cabbages). Conversely, the other two factual elements are plainly missing. As to (2), Plaintiff was not utilizing the Alsop tractor trailer for *any* purpose at the time of his injury. At most, the Alsop tractor trailer was being passively employed to hold the remaining construction materials. Such is insufficient to establish *Plaintiff's* "use" of the vehicle. *See id.* (holding that Plaintiff was not using the insured truck when it was only being employed to hold the remaining cabbages). And in any event, Plaintiff's injury did not stem from *that* utilization. Instead, he had begun an entirely new task—directing Stevens's operation of the Bobcat—when he was injured. Finally, as to (3), Plaintiff was indeed actively engaged with *a* vehicle (the Bobcat) and its operator

(Stevens), just not the one he seeks coverage from.  That fact takes this case outside of *Slagle*'s reach.[6]  *See Slagle*, 267 Va. at 631–32

At bottom, even when viewed in the light most favorable to Plaintiff, the allegations here are insufficient to establish a "causal relationship between the incident and the employment of the [Alsop tractor trailer] was a vehicle." *Id.*  Failing this "critical inquiry" proves fatal to Plaintiff's claim that he was "using" the Alsop tractor trailer.

###### b. "Occupying"

The Court now turns its focus to the Policy's alternative requirement that an individual "occupy[]" the insured vehicle to be deemed an insured.  The Policy defines "occupying" as "in, upon, using, getting in, on, out of or off." ACE Policy 56.  Having already determined that Plaintiff was not "using" the Alsop tractor trailer at the time he was injured, the Court would need to find that Plaintiff was nevertheless "occupying" it for him to be entitled to coverage under the Policy.

The parties only briefly argue the issue of whether Plaintiff was "occupying" the Alsop tractor trailer.  Defendant argues that Plaintiff was not "occupying" the Alsop tractor trailer because "at the time of the [a]ccident, he was not 'vehicle oriented' relative to the [Alsop tractor trailer]."  Reply Supp. Mot. Dismiss ("Reply") 10, ECF No. 44.  Defendant distinguishes the instant facts from those of *Bratton* and *Moore* in support of its position.  *See id.*  Defendant argues that, unlike the plaintiffs in those cases, Plaintiff had sufficient time to begin an activity separate from getting out of or off the insured vehicle.  *See id.* at 10–11.  Defendant cites two additional Supreme Court of Virginia cases—*Pennsylvania National Mutual Casualty Insurance Company v. Bristow* and *Edwards v. Government Employees Insurance Company*—for the proposition that

---

[6] In other words, *Slagle* would be on point if the insured vehicle central to the instant analysis was the Bobcat—i.e., the vehicle Plaintiff was actively directing at the time of his injury.  *See Slagle*, 267 Va. at 637–38.  However, because Plaintiff instead alleges that he was "using" the Alsop tractor trailer, *Slagle* is inapposite.

the sort of fleeting, incidental contact with an insured vehicle at issue here does not rise to the level of "occupying" a vehicle. *See id.* at 12. For his part, Plaintiff briefly references *Bratton*'s interpretation of the term "occupying" and then points to a number of prior contacts between Plaintiff and the Alsop tractor trailer to argue that Plaintiff was using and/or occupying the vehicle at the time he was injured. *See id.* at 13–15. Plaintiff relies on these prior contacts to argue that he was still "vehicle oriented" to the Alsop tractor trailer when he was injured. *See id.* at 13–14.

To reiterate, the Policy covers anyone "occupying" the Alsop tractor trailer, defined by the Policy as meaning "in, upon, using, getting in, on, out of or off." ACE Policy 56. In considering the issue of occupancy, Virginia courts have eschewed bright lines rules in favor of a "totality of the circumstances" inquiry. *See Bratton*, 290 Va. at 325; *Moore*, 661 F. Supp. 3d at 479 (summarizing Virginia law). This analysis necessarily considers facts such as "the individual's proximity to the vehicle, the duration of time during which the individual acts, the particular actions taken, the situation in which the individual is acting, the motivation for the individual's actions, and the purpose of the policy's coverage." *Id.* Further, Virginia courts interpret the word "upon" in relation to the word "occupying," meaning that "to be 'upon' an insured vehicle is to have some connection with 'occupying' it." *Penn. Mut. Cas. Ins. Co. v. Bristow*, 207 Va. 381, 385 (1966). The Supreme Court of Virginia has also clarified that "the ordinary understanding of the process of 'getting out of' a vehicle does not necessitate ongoing physical contact with that vehicle." *Bratton*, 290 Va. at 325. Rather, the inquiry hinges on whether the totality of the circumstances establish that the individual was still "vehicle-oriented" at the time in question. *Id.* at 325–26. If those circumstances "establish that the individual was no longer 'vehicle oriented,' then the act of 'getting out of' the vehicle was complete." *Id.* at 326. (citation omitted).

22

Ultimately, the Court finds that the facts alleged are insufficient to establish that Plaintiff was "occupying" the Alsop tractor trailer at the time he was injured.  While there is no factual analog that fits quite as neatly as *Parker* did in the "use" inquiry, standard tools of interpretation and a comparison of the instant facts with the relevant caselaw nevertheless compel this conclusion.

Returning first to the language of the Policy, "occupying" is defined as "in, upon, using, getting in, on, out of or off."  At the time he was injured, Plaintiff alleges he was standing roughly ten feet away from the insured Alsop tractor trailer, directing Stevens's operation of the Bobcat with hand signals.  Am. Compl. ¶¶ 39–41; Chesterfield County Compl. ¶ 47.  For that reason, Plaintiff was clearly not "in" or "getting in" the Alsop tractor trailer.  *See In*, MERRIAM-WEBSTER'S DICTIONARY (defining "in" as both "*within* a particular place" and "a function word [used] to indicate inclusion, location, or position *within limits*") (emphasis added).[7]  Plaintiff's position relative to the Alsop tractor trailer and his contemporaneous direction of Stevens likewise reveal that he was not in the process of "getting on . . . or off" the truck at the time he was injured.  *See On*, MERRIAM-WEBSTER'S DICTIONARY (defining "on" as both "in . . . a position of contact with an upper surface" and "a function word [used] to indicate a position *in contact with* and supported by the top surface of"); *Off*, MERRIAM-WEBSTER'S DICTIONARY (defining "off" as "so as to be separated from support," and noting adverb synonyms of "down" and "out").  And the Court has already established that Plaintiff was not "using" the Alsop tractor trailer at the time he was injured.  *See supra* Part IV.A.2.a.

In view of the above, Plaintiff's only remaining avenues to establish he was "occupying" the Alsop tractor trailer hinge on his ability to show that he was either "upon" or "getting out of"

---

[7] "Virginia courts customarily turn to dictionaries for help in deciphering a term's plain meaning." *Travelers Indem. Co. of Am. v. Portal Healthcare Sols., LLC*, 35 F. Supp. 3d 765, 770 (E.D. Va. 2014).

the vehicle at the time he was injured.  *See* ACE Policy 56–57.  Beginning with the former, Virginia courts have observed that "a person may be said to be 'upon' a vehicle when he is in a status where he is not actually 'in,' or is not in the act of 'entering into or alighting from,' the vehicle, but whose connection therewith immediately relates to his 'occupying' it."  *Bristow*, 207 Va. at 385.  The Supreme Court of Virginia considered this term in both *Bristow* and *Edwards*.  In *Bristow*, the Court held that the plaintiff was not "upon" the insured vehicle because "he had not occupied [it], . . . nor did he intend to occupy it.  His touching of the vehicle was merely incidental to his kindly act as a Good Samaritan."  *Id.*  Similarly, the *Edwards* Court held that the plaintiff was not "upon" the insured vehicle because his "act of attempting to replace the tire on the insured vehicle was not an act immediately related to the occupancy of the vehicle."  *Edwards v. Gov't Emps. Ins. Co.*, 256 Va. 128, 135 (1998).  Instead, the plaintiff's "actions at the time of the incident immediately related to his attempt to change the flat tire."  *Id.*  Also relevant to the Supreme Court of Virginia's conclusion in *Edwards* was that the plaintiff's "actions did not constitute a physical presence in or on the insured vehicle."

Here, Plaintiff was likewise not "upon" the Alsop tractor trailer.  Just like the plaintiff in *Edwards*, Plaintiff's actions at the time he was injured—directing Stevens's operation of the Bobcat—were not "immediately related to the occupancy" of the Alsop tractor trailer.  *See id.* at 135.  Instead, Plaintiff's actions were immediately related to the task of transporting construction materials to their designated drop zone.  And just like the plaintiff in *Bristow*, any interaction Plaintiff had with the Alsop tractor trailer was "merely incidental" to his true purpose—again, transporting the construction materials to their drop zone.  *Bristow*, 207 Va. at 385.  Solidifying this conclusion is the fact that Plaintiff—like the plaintiff in *Bristow*—"had not occupied [the

insured vehicle], . . . nor did he intend to occupy it." *Id.* Such circumstances preclude a finding that Plaintiff was "upon" the Alsop tractor trailer.

Plaintiff's only remaining avenue to coverage thus depends on the "getting out of" language of the Policy. In determining whether an individual is "getting out of" a vehicle, Virginia courts must "consider the totality of the circumstances." *Bratton*, 290 Va. at 325. The touchstone of this inquiry concerns whether "the individual was . . . vehicle-oriented" as to the insured vehicle at the time they were injured. *Id.* at 326 (internal quotations and citations omitted). If the totality of the circumstances "establish that the individual was no longer 'vehicle-oriented,' the act of 'getting out of' the vehicle was complete." *Id.* (quoting Robert Roy, Annotation, *What Constitutes "Entering" or "Alighting From" Vehicle Within Meaning of Insurance Policy, or Statute Mandating Insurance Coverage*, 59 A.L.R. 4th 149, § 2(a) (2012)).

Both *Bratton* and *Moore* considered insurance policies with "getting out of" language akin to that at issue here. In *Bratton*, a construction worker, Slone, was filling the front-end loader of a dump truck with asphalt while periodically exiting to check for spills. *Id.* at 319. Shortly before being struck by another vehicle, Slone (1) lowered the dump truck bed; (2) left the truck cab and closed the door with the engine still running; and (3) walked at least nine feet to check the rear tires for spills. *Id.* at 327–28. In light of these circumstances, the *Bratton* court determined that Slone was "still vehicle-oriented" at the time of the collision, and therefore still "in the process of 'getting out of' the dump truck." *Id.* at 328. This Court grappled with the same issue just last year in *Moore*. *See Moore*, 661 F. Supp. 3d at 478–80. Moore was a tow truck driver who was struck and injured by another vehicle while he was in the process of hooking the insured's disabled RV to his tow truck. *Id.* at 472–73. On the issue of whether Moore was "occupying" the RV, this Court considered the totality of the circumstances and held that Moore was indeed occupying the

insured RV at the time he was injured. *Id.* at 480. Critical to that determination were the following facts: (1) Moore was in close proximity to the vehicle, touching *and entering* it frequently; (2) Moore was acting to return the vehicle to an operable state, and was acting to move and control the RV in furtherance of that end; and (3) the entire process of preparing the RV for transportation was "involved and careful, requiring a sustained period of time to complete." *Id.*

Neither *Bratton* nor *Moore* help Plaintiff. Plainly, the circumstances here reveal that Plaintiff was not "vehicle-oriented" as to the Alsop tractor trailer at the time he was injured. *See Bratton*, 290 Va. at 327–28. To begin, Plaintiff's only interactions with the Alsop tractor trailer involved unloading construction materials that were on it. He did not drive the tractor trailer, he was never in the tractor trailer, and he was only very briefly *on* the tractor trailer. Moreover, even Plaintiff's brief time on the tractor trailer was in furtherance of a discrete activity—helping Stevens load the Bobcat—separate from the one he was engaged in at the time he was injured, i.e., directing Stevens to the drop zone. Thus, even if Plaintiff's prior presence on the tractor trailer meant he was occupying it at *that* time, any such occupation of the truck had ended when Plaintiff's new task *off* and *away from* the truck began.

The totality of these circumstances stands in stark contrast to both *Bratton* and *Moore*. In the former, Slone had actually been inside the insured vehicle, and his actions at the time he was struck remained clearly *directed toward* the insured vehicle. *See Bratton*, 290 Va. at 327–28. Moreover, he "did not have enough time to begin a new activity separate from getting out of the vehicle." *Id.* at 328. In other words, he was still vehicle-oriented as to the insured vehicle. *See id.* The same is true for Moore; at the time he was struck, he was close to the insured vehicle, touched and entered it frequently, and his overall mission remained directed toward it. *See Moore*, 661 F. Supp. 3d at 478–80. The same cannot be said here. At the time Plaintiff was injured, he

was roughly ten feet away from the Alsop tractor trailer and had already begun the entirely separate activity of directing Stevens to the drop zone.  It would defy common sense to hold that actions so spatially, operationally, and temporally removed from the insured vehicle still qualify as "getting out of" the Alsop tractor trailer.  *See Bratton*, 290 Va. at 328 (holding that Slone was still vehicle-oriented and "getting out of" the dump truck because he "did not have enough time to begin a new activity separate from getting out of the vehicle").

For the reasons outlined above, Plaintiff was not "in, upon, using, getting in, on, out of or off" the Alsop tractor trailer at the time he was injured.  Plaintiff was therefore not "occupying" the Alsop tractor trailer pursuant to the Policy, foreclosing that potential avenue to insured status.

### c. Summary

To summarize, Plaintiff's path to being deemed an "insured" under the ACE Policy depends upon his "using" and/or "occupying" the insured Alsop tractor trailer.  However, Plaintiff was not "using" the Alsop tractor trailer at the time he was injured because there exists no causal relationship between his injuries and the employment of the Alsop tractor trailer as a vehicle. Likewise, Plaintiff was not "occupying" the Alsop tractor trailer because (1) his actions did not fall within the plain language of the Policy's definition of the term, and (2) a comparison of the instant facts to the relevant caselaw establishes Plaintiff was not otherwise occupying the vehicle. Because Plaintiff was not "using" or "occupying" the Alsop tractor trailer at the time of his injuries, his claim to "insured" status is a nonstarter.  The Court will therefore dismiss Plaintiff's Complaint for failing to state a claim that he is entitled to coverage under the Policy.

3. Plaintiff Has Not Sufficiently Alleged That He Was Injured by an Uninsured or Underinsured Motor Vehicle

For the reasons outlined above, Plaintiff has no viable path to claiming "insured" status under the ACE Policy.  But in an abundance of caution, the Court considers the next step for

entitlement to uninsured or underinsured motor vehicle coverage—whether Plaintiff was injured by an uninsured motor vehicle.  Unfortunately for Plaintiff, the result on this issue is functionally identical to that in the "using" and "occupying" inquiry.

Under the ACE Policy—and in accordance with Virginia law—ACE agreed to pay "all sums *the 'insured'* is legally entitled to recover as damages from the owner or operator of an 'uninsured motor vehicle.'"  ACE Policy 56 (emphasis added); *see* Virginia Code § 38.2-2206(B).  Per the Policy, "uninsured motor vehicle" also includes "underinsured motor vehicle[s]," as defined in the Policy.  *See id.* at 56–57.  The benefits of such uninsured motorist coverage, however, extend only to those "injured by uninsured or underinsured motorists."  *Santens v. Progressive Gulf Ins. Co.*, 56 F. Supp. 3d 788, 792 (E.D. Va. 2014) (quoting *Jefferson v. Harco Nat'l Ins. Co.*, 2009 WL 1765670, at *3 (E.D. Va. 2009)); *see also Grossman v. Glens Falls Ins. Co.*, 211 Va. 195, 197–98 (Va. 1970); *White v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 913 F.2d 165, 169 (4th Cir. 1990).

As discussed *supra*, Plaintiff is not an "insured" under the ACE Policy, and the analysis can begin and end there.  But even if Plaintiff were an insured, he would still need to need to show that the vehicle that caused his injuries (the Bobcat) was either an "uninsured motor vehicle" or "underinsured motor vehicle" in order to establish his entitlement to coverage.  *See* ACE Policy 56–57; Virginia Code § 38.2-2206(B).  However, there is no evidence in the existing record about the insurance—or lack thereof—extending coverage to the Bobcat.  Without further information, there is no way to ascertain whether the Bobcat would be considered an "uninsured motor vehicle" pursuant to the ACE Policy or Virginia law.  Instead, all the Court knows from the pleadings is that Envirostruct, LLC owned the Bobcat, Chesterfield County Compl.¶ 34, and that Stevens was operating the Bobcat at the time of the incident.  Am. Compl. ¶ 29—30.  Such allegations either

28

do not counsel in favor of coverage, or are plainly insufficient for the Court to determine whether coverage under the Policy exists. *See, e.g.,* ACE Policy 57 (extending coverage to an "insured" on the basis of (1) the "owner or operator" of a vehicle that causes injury to an "insured" being "unknown," and/or (2) the insurance carrier for such vehicle denying coverage to the "insured" for "any reason whatsoever").

Put another way, the crux of this issue concerns whether any insurance policy specifically provides coverage for the Bobcat. The pleadings provide the Court with no answers as to that issue. Setting aside the independently dispositive finding that Plaintiff does not qualify as an insured under the Policy, dismissal of his Complaint is warranted for the independent, additional reason that he has pleaded insufficient facts relating to the insured/uninsured status of the Bobcat.[8]

### B. Reformation of the Policy Is Unnecessary

Plaintiff initially asked that the Court alternatively "reform the ACE Policy" such as to provide uninsured and/or underinsured motorist coverage as required by Virginia law. *See* Am. Compl. ¶ 92. However, the parties now appear to agree that reformation is unnecessary because the terms of the Policy incorporate and comport with Virginia law. *Compare* Mem. Supp. 12 ("In compliance with Virginia law, the ACE Policy defines an 'insured' as anyone 'occupying' a 'covered auto,' and the term 'occupying' includes 'using.'") (quoting ACE Policy 56), *and* Mem. Supp. 12 ("Regardless of whether the obligation to cover persons 'using' a covered motor vehicle is found in the ACE Policy itself, or can be found only in the Virginia Code, the meaning of 'using' is the same because 'the provisions of Code § 38.2–2206 are part of the contract of insurance.'") (quoting *Bratton*, 290 Va. at 329), *with* Mem. Opp'n 15–16 ("ACE states the 'regardless of

---

[8] Notably, Defendant devotes an entire section of its briefing to arguing that Plaintiff has failed to adequately plead facts related to the uninsured status of the Bobcat. *See* Mem. Supp. 18–19. Plaintiff does not appear to respond to this argument in its opposition briefing. *See* Mem. Opp'n 8–15. Even assuming Plaintiff's failure to respond does not constitute waiver on this issue, Defendant's position is the correct one.

whether the obligation to cover persons 'using' a covered motor vehicle is found in . . . the Policy

itself, or can be found only in the Virginia Code, the meaning of 'using' is the same . . . .  Taking

this representation as true, there would be no need to reform the [Policy].") (quoting Mem. Supp.

12).  The Court will therefore treat Plaintiff's reformation claim as having been withdrawn.[9]

## IV. CONCLUSION

For the reasons detailed above, ACE's Motion to Motion to Dismiss (ECF No. 36) will be

granted.

An appropriate Order shall issue.

/s/ RCY
_____
Roderick C. Young
United States District Judge

Richmond Virginia
Date: April 23, 2024

---

[9] In any event, the Policy certainly comports with Virginia law and need not be reformed.  Virginia Code § 38.2-2206 provides that insurers must provide uninsured motorist coverage to those that "use the motor vehicle to which the policy applies."  VA. CODE ANN. § 38.2-2206(A), (B).  The ACE Policy does so here by (1) extending coverage to those who "occupy[]" the insured vehicle, and (2) considering those who "use" the vehicle to be "occupying" the vehicle.  ACE Policy 56; *see Bratton*, 290 Va. at 329 ("Accordingly, the [policy], like many motor vehicle insurance policies, includes 'use' or 'using' as a type of 'occupying' a 'covered auto.'  But whether the obligation is found in the insurance policy itself, or can be found only in the Code, the meaning of 'use' or 'using' is the same because '[t]he provisions of . . . Code § 38.2–2206 are part of the contract of insurance, and we will not consider language in a policy that, arguably, is inconsistent with the statute as we have construed it.'" (cleaned up)).